UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

-------------------------------------------------------------------- X

YITZHAK BEN-YISHAI and MIRIAM BEN-YISHAI,
individually and as representatives of the Estate of
Shshana Ben-Yishai; JACOB BEN-YISHAI; ISRAEL
BEN-YISHAI; CHANA BEN-YISHAI; AVIEL BEN-
YISHAI,
38 Herzl Boulevard
Jerusalem, Israel

Case No:
18-cv-_____

Plaintiffs,

-against-

**COMPLAINT**

**JURY TRIAL DEMANDED**

THE SYRIAN ARAB REPUBLIC,
c/o Foreign Minister Walid Mohi Edine al-Muallem,
Ministry of Foreign Affairs
Damascus, Syria;

THE ISLAMIC REPUBLIC OF IRAN
Ministry of Foreign Affairs
Khomeini Avenue, United Nations Street
Teheran, Iran,

THE IRANIAN MINISTRY OF INFORMATION AND
SECURITY,
Pasdaran Avenue,
Goestan Yekon, Iran

Defendants.

-------------------------------------------------------------------- X

Plaintiffs, by their undersigned counsel complain of the Defendants, and hereby allege

for their Complaint as follows upon information and belief:

1

## INTRODUCTION

1.      This is a civil action for wrongful death, personal injury and related torts pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602, *et seq*., arising from the November 4, 2001, terrorist shooting attack aboard a civilian bus in Jerusalem, Israel in which two people were murdered, including Shoshana Ben-Yishai, 16, and forty five others were injured ("the French Hill Terrorist Attack").

2.      The French Hill Terrorist Attack was carried out by the Palestine Islamic Jihad using material support and resources provided by defendants the Syrian Arab Republic and the Islamic Republic of Iran, directly and through its instrumentality the Iranian Ministry of Information and Security.

3.      Decedent Shoshana Ben-Yishai, an American citizen, was shot on the bus and died of her injuries at the hospital later that day. The Ben-Yishai family suffered severe emotional injuries and other damages as a result of Shoshana's heinous murder and continue suffering until today.

## JURISDICTION

4.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1330-1332, 1367, and 1605A(a).

5.      Personal jurisdiction over the defendant will be established once the defendant is properly served pursuant to 28 U.S.C. 1608(a). 28 U.S.C. 1330(b).

6.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(f)(4) and the rules of pendent venue.

## THE PARTIES

7.      Plaintiff Miriam Ben-Yishai, the mother of Shoshana Ben-Yishai, is an American citizen. Plaintiff Yitzhak Ben-Yishai is an American citizen and the father of Shoshana Ben-Yishai, They are the parents, heirs and personal representatives of the estate of decedent Shoshana Ben-Yishai. They bring this civil action individually and jointly as administrators of the Estate of Shoshana Ben-Yishai.

8.      Plaintiff Jacob D. Ben-Yishai, is an American citizen and the brother of the decedent Shoshana Ben-Yishai.

9.      Plaintiff Israel Ben-Yishai, is an American citizen and the brother of the decedent Shoshana Ben-Yishai.

10.     Plaintiff Chana Ben-Yishai is an American citizen and the sister of the decedent Shoshana Ben-Yishai.

11.     Plaintiff Yael Ben-Yishai, is an American citizen and the brother of the decedent Shoshana Ben-Yishai.

12.     Plaintiff Aviel Ben-Yishai, is an American citizen and the brother of the decedent Shoshana Ben-Yishai.

13.     Defendant Syria is and was, at all times relevant hereto, a foreign state within the meaning of 28 U.S.C. § 1603, designated continuously since 1979 as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)). Iran, through its political subdivisions, agencies, instrumentalities, officials, employees and agents provided the Palestine Islamic Jihad with material support and resources, for acts of extrajudicial killing within the meaning of 28 U.S.C. §§ 1605(a)(7), 1605A(a)(1), including the French Hill

Terrorist Attack, and performed other actions that enabled, facilitated and caused the French Hill Terrorist Attack and harm to the plaintiffs herein.

14. Defendant the Islamic Republic of Iran is and was, at all times relevant hereto, a foreign state within the meaning of 28 U.S.C. § 1603, designated continuously since 1979 as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)). Iran, through its political subdivisions, agencies, instrumentalities, officials, employees and agents provided the Palestine Islamic Jihad with material support and resources, for acts of extrajudicial killing within the meaning of 28 U.S.C. §§ 1605(a)(7), 1605A(a)(1), including the French Hill Terrorist Attack, and performed other actions that enabled, facilitated and caused the French Hill Terrorist Attack and harm to the plaintiffs herein.

15. Defendant The Iranian Ministry of Information and Security ("MOIS") is the central Iranian intelligence service. Within the scope of its agency and office, MOIS provided material support and resources for the commission of acts of extrajudicial killing, including the French Hill Terrorist Attack, and performed other actions, that enabled, facilitated and caused the French Hill Terrorist Attack and harm to the plaintiffs herein.

## UNDERLYING FACTS

### A.     The Palestine Islamic Jihad ("PIJ")

16. The Harakat al-Jihad al-Islami al-Filastini or the Palestinian Islamic Jihad was founded in the 1970s by a group of Palestinian students in Egypt. The organization, led by Fathi Shiqaqi, had originally been affiliated with the Egyptian Muslim Brotherhood movement but soon developed ideological differences that caused it to sever the connection and seek other sponsorship. The Palestinians felt that the Brotherhood were not sufficiently committed to

prioritizing the Arab world's conflict against Israel and were disappointed that the Egyptians did not view the existence of the Jewish State as the central dilemma plaguing Islamic society.

17.     The PIJ rejected the Brotherhood's contention that the primary task confronting of Arab society was to encourage a return to fundamentalist Islamic practices and only after achieving this religious goal could political matters such as combating Israel be undertaken. The Shiqaqi led group contended that the very existence of a Jewish State in the midst of the Islamic nations was the chief obstacle preventing the Muslim masses from unifying and fulfilling their religious obligations and rituals.

18.     Shaqaqi, therefore, proposed a new ideological program, which became the basis for the PIJ organization. He claimed that the unity of the Islamic world was not a precondition for the liberation of Palestine, but on the contrary, the liberation of Palestine by the Islamic movements was the key to the unification of the Arab and Islamic world. In other words: the religious struggle or jihad for the liberation of Palestine by Islamic movements will bring upon the expected jihad for the reconstruction of the greater and unified, pan-Islamic state.

19.     While searching about in Egypt for the practical means of implementing the PIJ's program in the late 1970s, Shaqaqi and his followers were riveted by the political events unfolding in Iran. The PIJ members watched with excitement and admiration as the Ayatollah Ruhollah Khomeini utilized Islamic teachings and manipulated religious sentiments to incite the Iranian people against the Imperial government and cause the Shah of Iran's downfall.

20.     Although the PIJ was a Sunni Islamic movement it openly and uniquely embraced the militant teachings and approach of the Shi'ite Islamic leaders of the Iranian revolution. In Khomeini's actions the PIJ saw an effective model for the use of violence to promote its radical agenda of eliminating competing moderate Palestinian ideological programs and implementing

an armed struggle against Israeli targets. Not only did they consider the Iranian revolution as a blueprint for the entire Arab world, but they embraced the Shi'ite principle of the leadership of the PIJ, now known as the "Shaqaqi faction," began to carry out terror attacks against Israel in 1984. In the days before what has been called the First Intifada (the period of 1987-1993), however, the technical competence and financial capabilities of the PIJ were greatly limited. The PIJ operated primarily in the Gaza Strip, and only occasionally succeeding in perpetrating an attack inside of an Israeli city.

21.     In March 1986 Israel arrested Shiqaqi and other PIJ leaders. The PIJ leadership was deported to Lebanon in 1988 in an effort by Israel to disrupt the organization's activities. Shiqaqi, however, continued to lead the PIJ in exile.

22.     In Lebanon, the PIJ leaders naturally sought out an alliance with the Iranian-backed Hizbollah terrorist organization. Hizbollah provided the PIJ members with military training, including bomb making and other logistic aid. The PIJ leaders were also taken to Hizbollah training camps where they were provided with lectures and military training courses directly from Iranian government instructors of the Iranian Revolutionary Guards Corps then stationed in Lebanon.

23.     During his time in Lebanon, Shaqaqi reorganized the PIJ and carried out recruitment in the Palestinian refugee camps. The involvement of the PIJ leaders with the Iranian Revolutionary Guard Corps officers resulted in closer cooperation with the Iranian government. Iran increased its support for the PIJ during this time and became its primary benefactor and financial sponsor as well as its only state sponsor. With massive and reliable financial support from Iran, access to the Hizbollah military training camps and instruction by Iranian Revolutionary Guard Corps officers, the PIJ was able to further establish itself as an effective

and influential terrorist organization and disseminate its radical Islamic ideology amongst the Palestinian residents of the West Bank and Gaza Strip.

24.     During his time in Lebanon, the PIJ leader also made contacts with the Syrian regime and its intelligence services, and solicited their support. Syria allowed the PIJ to open an office in Damascus that would eventually become an important headquarters for the terrorist organization.

25.     In the past several decades the PIJ has carried numerous deadly terrorist attacks including:

a.     In February 1990, PIJ terrorists attack an Israeli tour bus in Egypt, killing 11 people, including nine Israelis, and injuring 17.

b.     On April 6, 1994, PIJ militants exploded a car bomb next to a public bus in Afula, Israel, killing nine and injuring 50.

c.     On September 4, 1994 a PIJ drive-by shooting in Gaza killed one and injured several others.

d.     On November 11, 1994, a PIJ terrorist riding a bicycle detonated explosives strapped to his body at an Israeli army checkpoint at Netzarim junction in the Gaza Strip, killing three Israeli soldiers and wounding six Israeli soldiers and six Palestinians.

e.     On January 22, 1995, a PIJ terrorists detonated consecutive bombs explode at the Beit Lid junction near Netanya, Israel, killing 18 Israeli soldiers and one civilian.

f.     On April 9, 1995, a PIJ suicide bomber blew up his vehicle next to an Israeli bus in the Gaza Strip, killing seven Israeli soldiers and 20-year-old American college student Alisa Flatow.

g.  On March 4, 1996, a PIJ suicide bomber killed 13 and injured 75 at a Tel Aviv shopping mall.

h.  On July 30, 1997, two PIJ suicide bombers blew themselves up in the crowded Mahane Yehuda market in Jerusalem, killing 16 individuals and wounding about 175 others.

i.  On November 2, 2000, two people were killed in a car bomb explosion near the Mahane Yehuda market in Jerusalem. PIJ claims responsibility.

j.  On June 5, 2002, a PIJ suicide attack at Israel's Megiddo Junction killed 18 and injures 50 others.

k.  On October 4, 2003, a PIJ suicide bomber blew himself up at Maxim restaurant in Haifa, killing 22 and injuring 60.

l.  On October 26, 2005, a PIJ bombing at a market in Hadera, Israel kills five people.

m.  April 17, 2006, the PIJ .claimed responsibility for a suicide bombing that killed 11 people at a sandwich stand near Tel Aviv's old central bus station including a Florida student named Daniel Wultz. .

n.  In January 2007, a PIJ suicide attack at an Eilat bakery killed three people.

o.  In April 2008, the PIJ fired 216 rockets and mortar shells at various Israeli towns.

p.  On June 16, 2008, the PIJ claimed responsibility for firing a Grad rocket that hit a shopping mall in Ashkelon, Israel, wounding 15. Israeli authorities accuse Iran of providing PIJ with Grad rockets.

q.  On January 8, 2011, the PIJ fired two mortars into southern Israel, killing two Thai nationals.

r.      On August 20, 2011, the PIJ fired a barrage of rockets into southern Israel, killing one civilian and wounding seven others.

s.      On October 29, 2011, the PIJ fired a number of rockets into southern Israel, killing one civilian and wounding two others

t.      During March 2012, the PIJ fired almost 200 missiles into Israel from Gaza.

u.      On November 5, 2012, a PIJ bombing on a Tel Aviv bus wounds at least 30 people.

v.      July 8, 2014, the PIJ takes credit for firing 60 rockets in recent days,

w.      On July 28, 2014, seven Palestinian children die after a rocket strikes a playground in Gaza's al-Shati refugee camp, while another rocket hits al-Shifa Hospital. The rockets were misfires launched by the PIJ towards Israel.

x.      On October 3, 2015, the PIJ claims responsibility after 19-year-old Mohamed Halabi stabs two Israeli men to death in Jerusalem's Old City.

y.      On May 28, 2018, the PIJ fires 28 mortars at Israel from Gaza including one that lands outside of a kindergarten causing damage but no injuries.

z.      On November 12-14, 2018: the PIJ and other Gaza terror groups fire more than 450 rockets into Israel, killing one and wounding dozens.

## B.      Defendant Syria's Provision of Material Support and Resources to the PIJ

26.      Since 1979 until the present time, defendant Syria has been continuously designated by the United States Department of State as a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)).

27.      While the PIJ's leadership relocated to Syria in 1989, it left a small group in Lebanon that launched joint attacks with Hezbollah in the 1990s. In addition to its leadership

headquarters in Damascus, during the time relevant to the French Hill Terrorist Attack, Syria has also provided military aid, safe-haven, sanctuary, weapons and training to PIJ, allowing the terrorist group's leadership to occupy a Syrian Army base from 1989 until 2012. According to the U.S. State Department, PIJ's senior leadership continues to reside in Syria while some other leaders live in Lebanon, though most PIJ members live in Gaza. The international Arabic-language newspaper Asharq Al-Awsat reported in 2012 that PIJ's Syria-based leadership had relocated to Iran but continued to enjoy positive ties with their Syrian patrons. However, a PIJ official denied that report, claiming "relations between [PIJ] and the Syrian government are excellent, unlike Hamas," whose leadership left Syria after refusing to support the Assad regime during the Syrian civil war. Official representatives of the group are also stationed elsewhere in the Middle East, including Iran.

28.     During the period relevant hereto, including the several year period preceding the French Hill Terrorist Attack, defendant Syria provided the PIJ with material support and resources within the meaning of 28 U.S.C. § 1605A(a)(1), described in detail below, with the specific intention of causing and facilitating the commission of acts of extrajudicial killing and international terrorism including the French Hill Terrorist Attack. Such support was provided continuously, routinely and in furtherance and as implementation of a specific policy and practice established and maintained by Syria, in order to assist the PIJ achieve goals shared by Syria. These goals include terrorizing the Jewish civilian population in Israel, and weakening Israel's economy, social fabric, and military strength and preparedness through extremist violence targeting civilians.

29.     Defendant Syria provided the material support and resources detailed below to the PIJ pursuant to an agreement reached between Syria and the PIJ in the late 1980s. Under that

agreement, the PIJ undertook to carry out acts of extrajudicial killing and terrorism against Jews in Israel, the West Bank and Gaza, and in return Syria undertook to provide the PIJ with material support and resources to carry out such extrajudicial killings and terrorist attacks. The purpose of this agreement was to achieve the goals detailed in the preceding paragraph.

30.     The material support and resources which were provided by Syria to the PIJ in the years preceding the French Hill Terrorist Attack for the purpose of facilitating acts of extrajudicial killing and terrorism included *inter alia*: provision of financial support to the PIJ for the purpose of carrying out terrorist attacks; provision of military-grade explosives, military firearms and other weapons and material to the PIJ; provision of specialized and professional military training for the planning and execution of terrorist attacks (hereinafter: "terrorist training") to the PIJ; providing use of Syria-owned and operated training bases and military facilities in which terrorist training was provided to the PIJ and its terrorist operatives; providing the PIJ and its terrorist operatives with safe haven and refuge from capture in Syria and in areas of Lebanon controlled by Syria; providing the PIJ means of electronic communication and electronic communications equipment for carrying out terrorist attacks; financial services, including banking and wire transfer services, provided to the PIJ by financial institutions owned and controlled by Syria at Syria's direction, which services were intended to and did enable the PIJ to surreptitiously transfer funds used to finance terrorist attacks; and means of transportation, including allowing terrorist operatives of the PIJ passage and transportation on Syrian-owned aircraft to allow them to avoid detection and carry out further terrorist attacks.

31.     At all times relevant hereto, defendant Syria provided the PIJ and its terrorist operatives with terrorist training at military training bases, camps and facilities operated and/or funded and/or controlled by Syria and located in Syria and in areas of Lebanon controlled by

Syria, with the specific intention of causing and facilitating the commission of acts of extrajudicial killing and international terrorism including the French Hill Terrorist Attack. This terrorist training, which was professional and extensive and included the use of explosives, firearms and other weapons, was provided by and through Syrian military and intelligence officials, and other agents, employees and officials of Syria acting within the scope of their agency and employment and under the express command and authorization of Syria.

32.     In addition, at all times relevant hereto, Syria provided terrorist training, weapons, and funds to be used to carry out terrorist attacks to the PIJ and its terrorist operatives, by and through the agency of other terrorist organizations which received material support and resources from Syria, and which acted as instrumentalities, agents and proxies of Syria for the purpose of providing terrorist training and other material support and resources to the PIJ.

33.     At all times relevant hereto, Syria provided the PIJ and its terrorist operatives with lodging, safe haven and shelter in Syria and in areas of Lebanon controlled by Syria, with the specific intention of preventing their apprehension and permitting them to plan and carry out acts of extrajudicial killing and international terrorism freely and unhindered. This lodging, safe haven and shelter was provided on military bases and facilities, and in residences, owned and controlled by Syria.

34.     Defendant Syria gave substantial aid, assistance and encouragement to the PIJ, and provided the massive material support and resources described above to the PIJ, and thereby aided and abetted the PIJ, all with the specific intention of causing and facilitating the commission of acts of extrajudicial killing and international terrorism including the French Hill Terrorist Attack. Defendants Syria did so with actual knowledge that the PIJ had killed and injured numerous U.S. citizens in terrorist bombings and that additional U.S. citizens and other

innocent civilians would be killed and injured as a result of their aiding, abetting and provision of material support and resources to the PIJ.

35.     Defendant Syria knowingly and willingly conspired, agreed and acted in concert with the PIJ, in pursuance of the common plan, design, agreement and goals discussed above, to cause and facilitate the commission of acts of extrajudicial killing and international terrorism including the Terrorist Attack. Defendant Syria did so with actual knowledge that the PIJ had killed and injured numerous U.S. citizens in terrorist bombings and that additional U.S. citizens and other innocent civilians would be killed and injured as a result of their conspiracy with the PIJ.

## C.     Defendants Iran and MOIS' Provision of Material Support and Resources to the PIJ

36.     Since 1984 until the present time, defendant Iran has been continuously designated by the United States Department of State as a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)).

37.     During the period relevant hereto, including the several year period preceding the French Hill Terrorist Attack, defendants Iran and MOIS provided the PIJ with massive financial support with the specific intention of causing and facilitating the commission of acts of extrajudicial killing and international terrorism including the French Hill Terrorist Attack. Such financial support was provided continuously, routinely and in furtherance and as implementation of a specific policy and practice established and maintained by Iran, in order to assist the PIJ achieve goals shared by Iran. These goals included terrorizing the Jewish civilian population in Israel, and weakening Israel's economy, social fabric, and military strength and preparedness.

38.     The Iranian defendants provided this financial support to the PIJ pursuant to an agreement reached between Iran and the PIJ in the 1980s which remains in force until today. Under that agreement, the PIJ undertook to carry out acts of extrajudicial killing and terrorism against Jews in Israel, the West Bank and Gaza, and in return Iran undertook to provide the PIJ with financial support to carry out such extrajudicial killings and terrorist attacks. The purpose of this agreement was to achieve the goals detailed in the preceding paragraph.

39.     The Iranian defendants gave substantial aid, assistance and encouragement to one another and to the PIJ, and provided massive financial support to the PIJ, and thereby aided and abetted the PIJ, all with the specific intention of causing and facilitating the commission of acts of extrajudicial killing and international terrorism including the French Hill Terrorist Attack. The Iranian defendants did so with actual knowledge that the PIJ had killed and injured numerous U.S. citizens in terrorist bombings and that additional U.S. citizens and other innocent civilians would be killed and injured as a result of their aiding, abetting and provision of material support and resources to the PIJ.

40.     The Iranian defendants knowingly and willingly conspired, agreed and acted in concert with one another and with the PIJ, in pursuance of the common plan, design, agreement and goals discussed above, to cause and facilitate the commission of acts of extrajudicial killing and international terrorism including the French Hill Terrorist Attack. The Iranian defendants did so with actual knowledge that the PIJ had killed and injured numerous U.S. citizens in terrorist bombings and that additional U.S. citizens and other innocent civilians would be killed and injured as a result of their conspiracy with the PIJ.

41.     At all times relevant hereto, defendant MOIS was an agency, instrumentality and/or office of defendant Iran, and performed acts on behalf of defendant Iran, in furtherance of

the interests and policy of defendant Iran and within the scope of its agency and office, within the meaning of 28 U.S.C. § 1605A(a)(1) and 28 U.S.C. § 1605A(c), which caused the French Hill Terrorist Attack and harm to the plaintiffs herein, in that defendant MOIS implemented and acted as a conduit and instrumentality for Iran's provision of funds to the PIJ for the commission of acts of extrajudicial killing and international terrorism including the French Hill Terrorist Attack.

42.     Defendant Iran authorized, ratified and approved the acts of defendant MOIS. Accordingly, defendant Iran is vicariously liable for the acts of defendant MOIS.

**D.     The French Hill Terrorist Attack**

43.     On November 4, 2001 a terrorist later identified as Hatem Yaqin Yesh Al-Sheweikeh, from the city of Hebron, boarded the Jerusalem Egged Bus Number 25 armed with an M-16 automatic rifle, near the French Hill neighborhood. At approximately 3:45 pm Al-Sheweikeh opened fire on the bus passengers as the vehicle stopped at a traffic light.

44.     Shoshana Ben-Yishai, a 16 year old high school student known to her family and friends as "Shoshie," was a passenger on the bus returning home from classes that day. She had moved from Long Island, New York to Israel with her family at the age of five. As the gunman opened fire, Shoshie Ben-Yishai was shot in the head and killed along with another student on the bus, Menashe Regev, aged 14. Forty-five other passengers were injured in the attack.

45.     The murderer, Al-Shewwikeh, was a member of the PIJ. After perpetrating the shooting, he was shot to death by a Jerusalem police officer as he fled from the attack. Israeli Police Chief Mickey Levy identified the gunman as a PIJ terrorist. Afterwards, the PIJ formally took responsibility for the attack.

46.     On March 18, 2009 the Haifa District Court expressly ruled, based upon evidence submitted by the Israeli government, that the French Hill Shooting Attack was planned by a terrorist named Diab Abdel Rahim Abdel Shweiki, and that Shweiki was a senior PIJ operative.

47.     Plaintiff Yitzhak Ben-Yishai, the father of Shoshie heard the news of the terrorist shooting on the Number 25 bus. Knowing that his daughter took this bus home from school, rushed to the scene. The news report initially indicated that passengers had only been slightly wounded. He attempted to contact Shoshie on her mobile phone, but there was no response. He was permitted to enter the area of the French Hill Terrorist Attack to search for his daughter but could not locate her.

48.     After learning of the bus attack and knowing it had occurred on Shoshie's usual bus route, Miriam Ben-Yishai, Shoshie's mother, frantically telephoned many hospitals searching for news of her daughter. Someone finally advised Miriam Ben-Yishai that Shoshie had received head injuries in the attack and had been taken to Share Tzedek Hospital in Jerusalem.

49.     Upon arrival at the hospital Miriam Ben-Yishai met her husband Yitzhak Ben-Yishai and they were informed of their daughter's death. They were taken to the hospital's morgue. There they found Shoshie's body covered with a sheet. The parents went into a state of extreme shock.

50.     As a result of the attack, and the murder of their teenage daughter, Miriam Ben-Yishai and Yitzhak Ben-Yishai, have experienced severe mental anguish, extreme emotional pain and suffering, loss of their daughter's society, companionship, comfort, advice and counsel. They also suffer from feelings of severe grief, anxiety, anger and depression that continue until today.

51.     As a result of the shocking murder of their sister, Jacob Ben-Yishai, Israel Ben-Yishai, Chana Ben-Yishai, Yael Ben-Yishai and Aviel Ben-Yishai have all experienced severe mental anguish, extreme emotional pain and suffering, loss of their sister's society, companionship, comfort, advice and counsel. The siblings also suffer from feelings of severe grief, anxiety, anger and depression that continue until today.

52.     The terrorist murder of 16 year old Shoshie during the French Hill Shooting Attack tore the Ben-Yishai family's world apart.

## FIRST CLAIM FOR RELIEF
## FOR DAMAGES UNDER 28 U.S.C. §1605A(c)

53.     The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

54.     Syria is a foreign state that since 1979 has continuously been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A.

55.     Iran is a foreign state that since 1984 has continuously been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A. At all relevant times, defendant MOIS was an agent and/or office of defendant Iran, acting within the scope of its agency and/or office.

56.     The defendants provided material support and resources to the PIJ, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the French Hill Terrorist Attack. The French Hill Terrorist Attack was an act of extrajudicial killing within the meaning of 28 USC § 1605A.

57.     Decedent Shoshana Ben-Yishai was severely injured by the French Hill Terrorist Attack and died as a result of those injuries. The maiming and murder of Shoshana Ben-Yishai

caused decedent, her estate and all the other plaintiffs severe injury, including: conscious pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

58.     As a direct and proximate result of the conduct of the defendants, Plaintiffs suffered the injuries and harm described herein.

59.     The defendants are therefore jointly and severally liable under 28 USC 1605A(c)for the full amount of plaintiffs' damages.

60.     The conduct of the defendants was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

### SECOND CLAIM FOR RELIEF
### FOR WRONGFUL DEATH AND BATTERY
### (Under 28 U.S.C. § 1605A(a) and common law)

61.     The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

62.     Defendants, personally and/or through their agents and/or employees and/or co-conspirators, willfully and deliberately authorized, organized, planned, aided, abetted, induced, conspired to commit, provided material support for and executed the French Hill Terrorist Attack.

63.     Defendants' behavior constituted a breach of legal duties to desist from committing, or aiding, abetting, authorizing, encouraging or conspiring to commit acts of extrajudicial killing, and to refrain from intentionally, wantonly, and/or negligently authorizing or causing the infliction of death, physical injuries and harm to persons such as the plaintiffs herein and the decedent.

64.     These willful, wrongful, and intentional acts constitute battery upon Shoshana Ben-Yishai, causing injury to her.

65.     Defendants' actions were willful, malicious, intentional, wrongful, unlawful, negligent and/or reckless and were the proximate cause of the French Hill Terrorist Attack.

66.     At the time of her death, decedent Shoshana Ben-Yishai was a much beloved 16 year student, enjoying good health, industrious and in possession of all her faculties.

67.     The French Hill Terrorist Attack caused decedent, her estate and all the other plaintiffs severe injury, including: pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

68.     Defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages.

69.     The conduct of the defendants was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.


### THIRD CLAIM FOR RELIEF ON BEHALF
### OF THE ESTATE OF SHOSHANA BEN-YISHAI
### FOR SURVIVAL DAMAGES
### (Under 28 U.S.C. § 1605A(a) and common law)

70.     The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

71.     The French Hill Terrorist Attack caused by defendants' actions herein caused decedent Shoshana Ben-Yishai and her estate severe injury, including pain and suffering, pecuniary loss and loss of income. From the time of the French Hill Terrorist Attack until the

time of her death, decedent Shoshana Ben-Yishai suffered great conscious pain, shock and physical and mental anguish.

72.     Defendants are therefore jointly and severally liable to the Estate of Shoshana Ben-Yishai for the full amount of decedent's damages, in such sums as may hereinafter be determined.

73.     The conduct of the defendants was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages. damages.

**FOURTH CLAIM FOR RELIEF**
**FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Under 28 U.S.C. § 1605A(a) and common law)**

74.     The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

75.     Defendants' conduct was willful, outrageous and dangerous to human life, and violates applicable criminal law, all international standards of civilized human conduct and common decency.

76.     Defendants intended to, and did in fact, terrorize the plaintiffs, and cause them egregious emotional distress. As a result and by reason of the French Hill Terrorist Attack, which was caused by the actions of defendants described herein, all the plaintiffs have suffered and will continue to suffer terror, severe mental anguish, bereavement and grief, and injury to their feelings.

77.     Defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages.

78.     The conduct of the defendants was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

### FIFTH CLAIM FOR RELIEF
### FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Under 28 U.S.C. § 1605A(a) and common law)

79.     The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

80.     Defendants' conduct was willful, outrageous and/or grossly negligent, and was dangerous to human life, and constituted a violation of applicable criminal law and all international standards of civilized human conduct and common decency.

81.     Defendants' conduct terrorized the plaintiffs and caused them egregious emotional distress.

82.     Defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages.

83.     The conduct of the defendants was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

### SIXTH CLAIM FOR RELIEF
### FOR CIVIL CONSPIRACY

84.     The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

85.     The defendants knowingly and willingly conspired, agreed and acted in concert with each other and with the PIJ in a common plan and design to facilitate and cause acts of

international terrorism, extrajudicial killing and personal injury including the French Hill Terrorist Attack which harmed plaintiffs.

86.     As a result of the French Hill Terrorist Attack caused, resulting from and facilitated by the conspiracy between the defendants and the PIJ, plaintiffs suffered the damages enumerated herein.

87.     Defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages.

## SEVENTH CLAIM FOR RELIEF
## FOR AIDING AND ABETTING

88.     The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

89.     The defendants provided the PIJ with material support and resources within the meaning of 28 U.S.C. §1605A, and other substantial aid and assistance, in order to aid, abet, facilitate and cause the commission of acts of international terrorism, extrajudicial killing and personal injury including the French Hill Terrorist Attack which harmed the plaintiffs.

90.     As a result of the French Hill Terrorist Attack caused, resulting from and facilitated by the defendants' provision of material support and resources and other acts of aiding and abetting, plaintiffs suffered the damages enumerated herein.

91.     Defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages.

**EIGHTH CLAIM FOR RELIEF**
**AGAINST THE IRANIAN DEFENDANTS**
**FOR VICARIOUS LIABILITY/RESPONDEAT SUPERIOR**

92.     The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

93.     At all relevant times, defendant MOIS was an agent and/or office of defendant Iran, acting within the scope of its agency and/or office. Defendant MOIS engaged in the acts described herein within the scope of its agency and/or office and to further the interests of defendant Iran.

94.     Defendant Iran authorized, ratified and/or condoned the conduct of defendant MOIS.

95.     Therefore, defendant Iran is vicariously liable for the acts of defendant MOIS.

96.     The Iranian defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages, in such sums as may be hereinafter determined.


**JURY DEMAND**

97.     Plaintiffs demand trial by jury of all issues legally triable to a jury.


**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiffs demand judgment as follows:

a.      Judgment against the defendant for compensatory damages in an amount to be determined at trial;

b.      Judgment against the defendant for punitive damages in an amount to be determined at trial;

c.      Plaintiffs' costs and expenses;

d.      Plaintiffs' attorneys fees; and

e.      Such other and further relief as the Court finds just and equitable.

Dated: December 30, 2018
       Brooklyn, New York

                                    Respectfully submitted,

                                    THE BERKMAN LAW OFFICE, LLC
                                    *Counsel for Plaintiffs*


                                    By:____/s/ Robert J. Tolchin_____
                                           Robert J. Tolchin
                                           (D.C. Bar #NY0088)

                                    111 Livingston Street, Suite 1928
                                    Brooklyn, New York 11201
                                    (718) 855-3627

                                    NITSANA DARSHAN-LEITNER & CO.
                                    Nitsana Darshan-Leitner
                                    *Israeli counsel for the plaintiffs*
                                    11 Havatikim Street
                                    Petah Tikva, Israel
                                    Israeli #: + 972-3-7514175