# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**YITZHAK BEN-YISHAI,** *et al.*,

    *Plaintiffs,*

v.

**THE SYRIAN ARAB REPUBLIC and**
**THE ISLAMIC REPUBLIC OF IRAN,**

    *Defendants.*

**Case No. 1:18-cv-3150-RCL**

## MEMORANDUM OPINION

On November 4, 2001, sixteen-year-old Shoshana Ben-Yishai was riding a bus home from school through the French Hill neighborhood of Jerusalem, Israel when a terrorist with an automatic rifle shot and killed her. The Palestinian Islamic Jihad ("PIJ") claimed responsibility for the attack. Plaintiffs, Shoshana's parents and younger siblings, ask the Court to hold the Syrian Arab Republic ("Syria") and the Islamic Republic of Iran ("Iran") liable for materially supporting the PIJ in carrying out the attack. They raise claims under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A(c), which guarantees a private cause of action for victims of state-sponsored terrorism. Neither defendant responded to this lawsuit, so the plaintiffs have moved for default judgment.

In this Memorandum Opinion, the Court will set forth its findings of fact and conclusions of law on the plaintiffs' claims. After considering the plaintiffs' motion and evidence, applying relevant case law, and taking judicial notice of related cases, the Court will **GRANT** the plaintiffs' motion for default judgment against Syria and Iran.

# I.    LEGAL STANDARD

The plaintiffs moved for default judgment against Syria and Iran because neither defendant has appeared or defended this lawsuit. *See* Mot. for Default J, ECF No. 44; Pls.' Mem. in Supp., ECF No. 44-1; Pls.' Proposed Findings of Fact and Conclusions of Law, ECF No. 44-4 ("Pls.' PFFCL"). But even when a defendant fails to appear, "the entry of a default judgment is not automatic." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005). The FSIA expressly provides that "[n]o judgment by default shall be entered . . . against a foreign state . . . unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014). A district court retains discretion "to determine precisely how much and what kinds of evidence the plaintiff must provide" to establish her claim or right to relief. *See Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014). "[I]ndeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (internal quotations and citation omitted), *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).

Additionally, a plaintiff moving for default judgment "must persuade the trial court" that it may exercise subject matter jurisdiction and personal jurisdiction over the defendant. *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 21 (D.D.C. 2019) (citing *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016)). After all, a default judgment "rendered in excess of a court's jurisdiction is void." *Jerez*, 775 F.3d at 422. And a default judgment "must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c).

2

## II.    FINDINGS OF FACT

Before this Court can enter default judgment against defendants, it must "reach its own, independent findings of fact" notwithstanding prior cases implicating the same issues. *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010). "[N]umerous evidentiary sources" can support a default judgment. *Id.* at 171. Additionally, "a court may take judicial notice of related proceedings and records in cases before the same court." *Id.* (internal quotations and citations omitted); Fed. R. Evid. 201(b). The plaintiffs here submitted evidence—personal declarations, declarations by experts, and expert reports. The Court also takes judicial notice of *Schertzman Cohen v. Islamic Republic of Iran*, No. 17-cv-1214 (JEB), 2019 WL 3037868, *1 (D.D.C. July 11, 2019), which involved the same attack,[1] as well as *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71 (D.D.C. 2017) and *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323 (D.D.C. 2020), which involved similar attacks. With these principles in mind, the Court enters the following findings of fact.

### A.  Plaintiffs' Claims

Plaintiffs are Shoshana's immediate family members—her parents, Yitzhak and Miriam, as well as her younger siblings Jacob, Israel,[2] Chana, Yael, and Aviel. Am. Compl., ECF No. 22, ¶¶ 7–12. Shoshana's parents also bring a claim on behalf of her estate. *Id.* ¶ 7. They sued Syria and Iran[3] under the FSIA, 28 U.S.C. § 1605A(c), alleging that the defendants "provided the

---

[1] The plaintiffs in *Schertzman Cohen* were survivors of the bus attack and their family members. *See* 2019 WL 3037868, at *1.

[2] The Court will use the English spelling of Mr. Ben-Yishai's name, consistent with his U.S. passport, rather than the Hebrew pronunciation. *See* Israel Ben-Yishai Decl., ECF No. 40, ¶ 1.

[3] The plaintiffs originally named the Iranian Ministry of Information and Security ("MOIS") as a defendant as well. Am. Compl. ¶ 15. Service was never successfully completed on MOIS, therefore the plaintiffs are no longer pursuing a claim against MOIS. *See* Pls.' Mem. in Supp. at 9 n.1. Thus, having never served MOIS, any claims against MOIS are dismissed by the Order accompanying this Memorandum Opinion.

Palestine Islamic Jihad with material support and resources, for acts of extrajudicial killing within the meaning of [the FSIA], including the French Hill Terrorist Attack, and performed other actions that enabled, facilitated and caused the French Hill Terrorist Attack and harm to the plaintiffs herein." *Id.* ¶¶ 13–14. The Amended Complaint in this action advances various theories of liability, including wrongful death, battery, survival, intentional infliction of emotional distress, negligent infliction of emotional distress, conspiracy, aiding and abetting, and vicarious liability. *See id.* ¶¶ 61–97. The plaintiffs also seek several forms of damages, such as economic damages, pain and suffering, solatium, and punitive damages. *Id.* ¶¶ 67–69, 72–73, 77–78, 82–83, 86–87, 90–91, 96.

### B. Service of Process

The plaintiffs first attempted to serve process on the defendants by requesting that the Clerk of the Court—pursuant to 28 U.S.C. § 1608(a)(3)—mail Syria and Iran a summons, complaint, and notice of suit. Aff. Requesting Foreign Mailing, ECF No. 5–7. That attempt at service failed because no company would ship packages to Iran. *See* 12/11/2019 Summons Return, ECF No. 9; 01/13/2020 Summons Return, ECF No. 12. The plaintiffs then attempted service on Syria and Iran via diplomatic channels pursuant to 28 U.S.C. § 1608(a)(4). Aff. Requesting Foreign Mailing, ECF No. 15. The plaintiffs successfully served Syria and Iran with a summons, a complaint, a notice of suit, and translations of each under cover of diplomatic note on August 10, 2020 and August 19, 2020, respectively. Return of Service, ECF No. 16 & 17. Both defendants failed to answer the complaint or appear in this litigation within sixty days of service. Accordingly, the Clerk of the Court entered default against Syria on December 3, 2020, Entry of Default, ECF No. 19, and against Iran on February 21, 2021, Entry of Default, ECF No. 24.

### C. Evidence Connecting Iran and Syria to the Attack and the PIJ

To detail Syria and Iran's connection to the PIJ, the Court relies on the expert reports and declarations submitted by plaintiffs in this case as well as the judicial findings in the *Cohen*, *Force*, and *Schertzman Cohen* decisions themselves.

*1. Expert Testimony*

To begin, the Court qualifies seven individuals as experts. The plaintiffs provided the Court with selected materials submitted in the *Cohen* and *Force* cases, namely, declarations prepared by and transcripts of testimony from five experts—Dr. Harel Chorev, Dr. Patrick Clawson, Dr. Marius Deeb, Dr. Matthew Levitt, and Col. (Ret.) Arieh Dan Spitzen. *See* Clawson Decl., ECF No. 41-1 [hereinafter "Clawson *Force* Decl."]; Levitt Decl., ECF No. 41-2; Deeb Decl., ECF No. 41-3 [hereafter "Deeb *Force* Decl."]; Spitzen Decl., ECF No. 41-4; Levitt and Spitzen Test. Tr., ECF No. 41-5; Clawson and Deeb Test. Tr., ECF No. 41-6; Chorev Decl., ECF No. 41-7; Clawson Decl., ECF No. 41-8 [hereinafter "Clawson *Cohen* Decl."]. Plaintiffs also provided the Court with materials unique to this case from three experts—Dr. Marius Deeb, Mr. Michael Soudry, and Dr. Rael Strous. *See* Deeb Decl., ECF No. 43 [hereinafter "Deeb *Ben-Yishai* Decl."]; Soudry Decl., ECF No. 39; Soudry Rep., ECF No. 39-2; Strous Decl., ECF No. 42; Strous Reps., ECF No. 42-2–42-8.

After reviewing these materials, the Court will take judicial notice of expert reports and testimony from the *Cohen* and *Force* proceedings. *See* Fed. R. Evid. 201(b); *Rimkus*, 750 F. Supp. 2d at 171. The Court therefore qualifies the following experts in this case:

- Harel Chorev. The court qualifies Dr. Chorev as an expert in "Palestinian terrorist networks." *See Cohen* Tr. 111:21–24, ECF No. 41-9; *see also* Chorev Decl.; *Schertzman Cohen*, 2019 WL 3037868, at *2.

- Patrick Clawson. The Court qualifies Dr. Clawson as an expert "on Iran's role as a State Sponsor of Terrorism, Iran's Islamic Revolutionary Guard Corps ["IRGC"], . . . and the IRGC's material support of Palestinian Islamic Jihad." *See Cohen* Tr. 139:20–25; *see also* Clawson *Cohen* Decl.; Clawson *Force* Decl.; *Schertzman Cohen*, 2019 WL 3037868, at \*2.

- Marius Deeb. The Court qualifies Dr. Deeb as an expert "on Syrian support for terrorism, specifically for Hamas and PIJ." *See Force*, 464 F. Supp. 3d at 337; *see also* Deeb *Ben-Yishai* Decl.; Deeb *Force* Decl.

- Matthew Levitt. The Court qualifies Dr. Levitt as an expert on "Iranian sponsorship of terrorism including Hamas and PIJ." *See* Levitt and Spitzen Test. Tr. 10:19–22, ECF No. 41-5; *see also Force*, 464 F. Supp. 3d at 337; Levitt Decl.

- Arieh Dan Spitzen. The Court qualifies Col. Spitzen as an expert "on the topic of Palestinian terror groups that operate within the Palestinian territories." *See* Levitt and Spitzen Test. Tr. 53:1–4; *see also Force*, 464 F. Supp. 3d at 337; Spitzen Decl.

- Michael Soudry. The Court qualifies Mr. Soudry as an expert in forensic accounting. *See* Soudry Decl.; Soudry *curriculum vitae*, ECF No. 39-1; Soudry Rep.; Pls.' PFFCL at 31.

- Rael Strous. The Court qualifies Dr. Strous as an expert in psychiatry. *See* Strous Decl.; Strous *curriculum vitae*, ECF No. 42-1; Strous Reps.

*2. November 4, 2001 Attack*

The Court finds satisfactory evidence in the record to demonstrate that the PIJ was responsible for the attack that killed Shoshana. As the court in *Schertzman Cohen* remarked, "[t]here is little controversy over whether the PIJ is responsible for the November 4, 2001, attack." 2019 WL 3037868, at \*4. That afternoon, a Palestinian gunman armed with an M-16 assault rifle neared an intersection in Jerusalem's French Hill neighborhood as the Egged bus No. 25 traveled toward the intersection. *See* Chorev Decl., ¶¶ 24, 25. As the bus approached, the gunman emptied a full magazine of bullets into the bus's side. *Id.* Shoshana and fourteen-year-old Menashe Regev were killed and forty-five others were injured. *Id.* The PIJ claimed responsibility for the attack via

6

the organization's official website and weekly newspapers. *See id.* ¶¶ 26–29. Dr. Chorev, qualified

as an expert in Palestinian terror networks, believes that these claims of responsibility are credible.

*Id.* Dr. Chorev also noted how the Israeli government attributed the attack to the PIJ, lending

credence to the PIJ's claims. See *id.* ¶¶ 30–34. Based on this evidence, Dr. Chorev, in his expert

opinion, "conclude[d] with a high degree of confidence that PIJ is responsible for the Attack." *Id.*

¶ 38. Based on the representations of plaintiffs' expert as well as the Court's review of the materials

before and findings by the *Schertzman Cohen* court, this Court finds the PIJ responsible for the

November 4, 2001 attack.

### 3.  *Iran's Material Support for the PIJ*

Since the 1979 Iranian Revolution, Iran has actively opposed Israeli interests in the Middle

East, primarily through like-minded non-state actor proxy forces, such as the PIJ. *See* Clawson

*Force* Decl. ¶¶ 27–28, 30–31; Levitt Decl. ¶¶ 90–91, 93. One such strategy Iran has employed to

attack Israel through proxies is to encourage and monetarily incentivize "lone wolves" to injure or

kill Israeli civilians. Clawson *Force* Decl. ¶ 28.

The PIJ—short for Palestinian Islamic Jihad or Al-Jihad Al-Islami fi Filastin—grew out of

a Palestinian student movement in Cairo led, most notably, by Fathi Shiqaqi. Levitt Decl. ¶ 90.

Inspired by the 1979 Iranian Revolution, Shiqaqi formed the PIJ in the early 1980s. *Id.* ¶ 93. The

PIJ's official goal "is the destruction of the State of Israel and the establishment of a sovereign,

Islamic Palestinian state" which "can only be achieved through armed struggle." Deeb *Ben-Yishai*

Decl. ¶ 12. Iran has been funding the PIJ since as early as 1993. Levitt Decl. ¶ 110. After a lull in

attacks in the late 1990s following Shiqaqi's assassination, the PIJ's attacks picked up sharply in

2000. *Id.* ¶¶ 102, 109. This increase in the PIJ's activity—and success in its efforts against Israeli

targets—coincided with an increase in Iranian support of the PIJ. *Id.* ¶ 108 (explaining Iran's

promise to increase funding for the PIJ by 70 percent in 2002 "to cover the expense of recruiting young Palestinians for suicide operations"); *see also id.* ("Tehran instituted an incentive system in which millions of dollars in cash bonuses are conferred to [the PIJ] for successful attacks.").

In October 2001, the month before the attack at issue here, the PIJ's Secretary General asserted, "[w]ith the grace of God and the blessing of the blood martyrs, the Islamic Jihad movement is the best condition it has ever been in," as result of "its jihadist effectiveness and qualitative operations." Clawson *Cohen* Decl. ¶ 34. And the PIJ was keen to act at its height of strength: from November 4, 2001 through October 2003, the PIJ carried out more than 440 terrorist attacks (including suicide bombings and other attacks), killing over 130 individuals and wounding about 880 more. Levitt Decl. ¶ 103.

Accordingly, the Court finds that Iran provided material support to PIJ during the time period relating to the attack.

### 4. Syria's Material Support for the PIJ

Like Iran, Syria has sought to reduce Israel's influence in the Middle East since the 1970s, primarily by supporting proxy forces. *See Force*, 464 F. Supp. 3d at 341. Syria formed a particularly close relationship with the PIJ, based on their "total agreement to forcefully fight against and obstruct the peace process" between Israel and Palestine. Deeb *Ben-Yishai* Decl. ¶ 16. In fact, since 1988, the PIJ's senior leadership has been based out of Damascus, Syria. Spitzen Decl. ¶ 312. PIJ leaders consistently praise Syrian leader Bashar al-Assad. Deeb *Ben-Yishai* Decl. ¶ 20. In the mid-2000s, the U.S. Department of the Treasury remarked that that "PIJ leadership in Damascus, Syria control[led] all PIJ officials, activists and terrorists in the West Bank and Gaza." *Force*, 464 F. Supp. 3d at 343 (internal citation omitted). Since 1993, Syria has supported the PIJ's efforts to obstruct any peace agreements between Israel and Palestine through the provision of

"funds, logistics, weapons, provision of safe haven, training in terrorist methods and strategic planning for terrorist operations." Deeb *Ben-Yishai* Decl. ¶ 16. By hosting and equipping the PIJ, Syria offered symbolic validation, political support, legitimacy, and freedom of maneuver, all of which enabled the PIJ to grow, develop, and carry out its violent activities. *Id.* ¶¶ 21–22.

Accordingly, the Court finds that Syria provided material support to the PIJ during the time period relating to the attack.

### III.   CONCLUSIONS OF LAW

This Court's conclusions of law will proceed in several parts. The Court will then address why it has subject matter jurisdiction under the FSIA's terrorism exception. Next, the Court will explain why it may validly exercise personal jurisdiction over Iran and Syria in this case. The Court will then discuss potential issues of timeliness and venue. After that, the Court will assess whether plaintiffs have stated cognizable claims for relief under § 1605A(c) of the FSIA. As the Court will explain, the plaintiffs have validly stated claims for relief, meaning that the Court can grant default judgment on these claims. Finally, the Court will award damages based on the claims and evidence presented here.

#### A.   Subject Matter Jurisdiction

The FSIA is the "sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Under the FSIA, federal district courts have original subject matter jurisdiction over (1) nonjury civil actions (2) for claims seeking relief *in personam* (3) against a foreign state (4) when the foreign state is not entitled to immunity under the FSIA. *See* 28 U.S.C. § 1330(a). Plaintiffs meet the first three requirements here. While the plaintiffs have demanded "trial by jury of all issues legally triable to a jury," Am. Compl. ¶ 97, no jury trial is available for FSIA claims. Thus, by default, this action

is a "nonjury civil action." *See Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 75 (D.D.C.

2017). Additionally, the plaintiffs bring civil claims against the defendants—Syria and Iran—as

foreign sovereigns for *in personam* relief.

That leaves the question of Syria and Iran's sovereign immunity. Foreign states are

presumptively immune from the jurisdiction of U.S. courts subject to several enumerated

exceptions. *See* 28 U.S.C. § 1604. A district court "has subject matter jurisdiction over a suit

against a foreign state if—and only if—[a] plaintiff's claim falls within" one of these exceptions.

*Odhiambo v. Republic of Kenya*, 764 F.3d 31, 34 (D.C. Cir. 2014). "[I]f no exception applies, the

district court has no jurisdiction." *Id.* Since federal courts must consider issues of subject matter

jurisdiction *sua sponte*, *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012), a district court adjudicating

FSIA claims must decide whether an exception to immunity applies "even if the foreign state does

not enter an appearance," *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493 & n.20

(1983).

Plaintiffs argue that Iran's conduct falls within the FSIA's terrorism exception. That

provision of the FSIA states that a foreign state has no immunity:

> in any case . . . in which [1] money damages are sought [2] against
> a foreign state [3] for personal injury or death [4] that was caused
> by [5] an act of torture, extrajudicial killing, aircraft sabotage,
> hostage taking, or the provision of material support or resources for
> such an act if such act or provision of material support or resources
> is engaged in by an official, employee, or agent of such foreign state
> while acting in the scope of his or her office, employment, or
> agency.

28 U.S.C. § 1605A(a)(1). This exception applies only if plaintiffs meet three additional

requirements. First, the foreign state must have been designated a state sponsor of terrorism when

the underlying attack occurred or designated as a result of the attack. *Id.* § 1605A(a)(2)(A)(i)(I).

Second, at the time of the underlying attack, the "claimant or victim" must have been a "national

10

of the United States," a "member of the armed forces," or an employee or contractor of the United States Government acting within the scope of her employment. *Id.* § 1605A(a)(2)(A)(ii). Third, if "the act occurred in the foreign state against which the claim has been brought," the claimant must have "afforded the foreign state a reasonable opportunity to arbitrate" the claim. *Id.* § 1605A(a)(2)(A)(iii).

Plaintiffs undoubtedly meet these elements. They seek money damages against Syria and Iran, foreign states. *See* Am. Compl., at ¶¶ 53–96. Plaintiffs allege personal injuries arising out of the attacks.[4] *See id.* Syria has been designated a state sponsor of terrorism since 1979, including at the time of the attacks. *See* Revision of Foreign Policy Controls on Exports to Syria, Iraq, Libya, and the People's Democratic Republic of Yemen, 45 Fed. Reg. 33955 (May 21, 1980). Similarly, Iran has been designated a state sponsor of terrorism since 1984, including at the time of the attacks. *See* Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran, 49 Fed. Reg. 2836 (Jan. 23, 1984). The attack took place in Israel—not Syria or Iran—meaning that plaintiffs need not afford defendants an opportunity to arbitrate these claims. And plaintiffs are also "claimant[s] or victim[s]" within the meaning of the FSIA because they are U.S. citizens. *See* 28 U.S.C. § 1605A(a)(2); Am. Compl.

Three elements remain. The Court may properly exercise subject matter jurisdiction if Syria and Iran (1) provided "material support or resources" for (2) acts of "extrajudicial killing" that (3) caused plaintiffs' injuries. *See* 28 U.S.C. § 1605A(a)(1). The Court will address each element in turn.

---

[4] The FSIA does not restrict the "personal injury or death" requirement to injury or death suffered *directly* by a claimant. *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 66 (D.D.C. 2010). Rather, the injury or death "must merely be the basis of a claim for which money damages are sought." *Id.* (citing 28 U.S.C. § 1605A(a)(1)).

*1. Material Support or Resources*

First, plaintiffs must show that Syria and Iran provided "material support or resources" for bus attack that resulted in their injuries. *See id.* The FSIA defines "material support or resources" as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, *training, expert advice or assistance*, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, *explosives*, personnel . . . , and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1) (emphases added); *see* 28 U.S.C. § 1605A(h)(3) (adopting definition of "material support or resources" found in 18 U.S.C. § 2339A). The material support or resources must have been provided "by an official, employee, or agent of [the] foreign state" acting in the scope of her "office, employment, or agency." 28 U.S.C. § 1605A(a)(1).

Plaintiffs satisfy this element. Dr. Chorev, an expert in Palestinian terrorist networks, "conclude[d] with a high degree of confidence" that the PIJ was responsible for the attack. Chorev Decl. ¶ 38. Dr. Clawson, an expert on Iranian state-sponsored terrorism and support for the PIJ, concluded in his expert opinion that "there is ample evidence that Iran has supplied substantial material support to PIJ." Clawson *Force* Decl. ¶ 70. Additionally, Dr. Deeb, qualified as an expert on Syria's support for terrorism, stated that "Syria has continuously and consistently supported the PIJ" since the organization's inception in late 1980s. Deeb *Ben-Yishai* Decl. ¶¶ 16, 21. The Court concurs with Dr. Chorev, Dr. Clawson, and Dr. Deeb and similarly agrees that Iran and Syria provided material support to the PIJ in the period leading up to the attack. This finding is consistent with the other judicial findings in this District which have found that Syria and Iran supported the PIJ during the timeframe surrounding the November 4, 2001 attack. *See, e.g.*, *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 30 (D.D.C. 2012); *Belkin v. Islamic Republic of Iran,* 667 F.

12

Supp. 2d 8, 6–17 (D.D.C. 2009); *Schertzman Cohen*, 2019 WL 3037868, at *4; *Force*, 363 F.

Supp. 3d at 337–43. The plaintiffs have therefore proven that Syria and Iran materially supported

the PIJ in the attack that resulted in their injuries.

    *2. Extrajudicial Killing*

    Second, plaintiffs must demonstrate that the underlying terrorist attack is an "act of . . .

extrajudicial killing" under the FSIA. *See* 28 U.S.C. § 1605A(a)(1). The FSIA defines an

"extrajudicial killing" by reference to the Torture Victim Protection Act of 1991 ("TVPA"). *See*

28 U.S.C. § 1605A(h)(7). An "extrajudicial killing"—as defined by the TVPA—is "a deliberated

killing not authorized by a previous judgment" of a "regularly constituted court" that "afford[s] all

the judicial guarantees . . . recognized as indispensable by civilized peoples." TVPA, Pub. L. No.

102-256, 106 Stat. 73, § 3(a) (1992). Thus, an "extrajudicial killing" contains three elements: "(1)

a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a

regularly constituted court." *Owens*, 864 F.3d at 770.

    The French Hill neighborhood bus attack meets all three requirements of an extrajudicial

killing. The attack resulted in the death of Shoshana, in other words, a completed killing. The

attack at issue in this case was also "deliberated." A deliberated killing is "one undertaken with

careful consideration, not on a sudden impulse." *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d

475, 491 (D.D.C. 2021) (quoting *Salzman v. Islamic Republic of Iran*, 2019 WL 4673761, at *13

(D.D.C. Sept. 25, 2019)). Col. Spitzen, an expert on Palestinian terror groups, describes how the

PIJ "has dedicated itself to the violent struggle against Israel, focusing its activities on anti-Israeli

terror." Spitzen Decl. ¶ 315. Dr. Chorev adds that the PIJ views "each Jewish civilian of Israel is

illegitimate and personally responsible for displacing Palestinians, and therefore a legitimate target

for violent attack." Chorev Decl. ¶ 17. Dr. Levitt, an expert on Iranian sponsorship of PIJ terrorism,

notes how Iran has long provided funding and specific training for terrorist activities to PIJ operatives. Levitt Decl. ¶¶ 30, 112, 114. Dr. Deeb, an expert on Syrian support for terrorism, confirmed that Syria has similarly assisted the PIJ in planning and executing attacks against civilians. Deeb *Ben-Yishai* Decl. ¶ 22. Thus, the Court finds that the attack was deliberated. Finally, no evidence in the record suggests that the attack at issue in this case was authorized by a judgment pronounced by a court of law. The Court therefore concludes that Syria and Iran's material support for the attack qualify as material support for acts of extrajudicial killing.

    *3.   Causation*

    To prove causation under the FSIA's terrorism exception, a plaintiff must show that the foreign state's actions proximately caused the alleged injuries. *Owens*, 864 F.3d at 794. Proximate causation requires "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Id.* (quoting *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004)). This inquiry contains two elements: (1) the defendant's actions "must be a 'substantial factor' in the sequence of events" leading to the injury; and (2) the injury must have been "'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct." *Id.* (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)).

    The plaintiffs have shown that Syria and Iran proximately caused their injuries stemming from the French Hill neighborhood bus attack. First, financial, material, and strategic support from Iran and Syria to the PIJ were substantial factors in the chain of events leading to the plaintiffs' injuries. *See* Levitt Decl. ¶ 108; Deeb *Ben-Yishai* Decl. ¶¶ 21–22. Second, plaintiffs' injuries were reasonably foreseeable consequences of Iran and Syria's promotion of the PIJ's terrorist attacks against civilians. As the *Force* court explained:

Iran not only supported these groups, they actively encouraged them to carry out attacks on civilians in Israel as part of a broader geopolitical strategy and provided [the PIJ] with the weapons and know-how to do so effectively. . . . Although Syria's support took a different form, it, too, was part of a broader geopolitical strategy that supported [ ] PIJ's operations and necessarily understood that Syrian support would enable them to carry out attacks on civilians in Israel. The death and injury to innocent people and the suffering of their families was, by any measure, foreseeable.

464 F. Supp. 3d at 369 (internal citations omitted).

Accordingly, this Court concludes that Syria and Iran proximately caused the plaintiffs' injuries through its material support for the extrajudicial killing of Shoshana. Since the plaintiffs have proven each element of the FSIA's terrorism exception, the Court possesses subject matter jurisdiction over this dispute under 28 U.S.C. § 1330(a) and § 1605A(a)(1).

### B. Personal Jurisdiction

The Court now turns to its personal jurisdiction over Syria and Iran. A court has "an independent obligation . . . to satisfy itself of its personal jurisdiction before entering a default [judgment] against a missing party." *Kaplan v. Central Bank of the Islamic Republic of Iran*, 896 F.3d 501, 512 (D.C. Cir. 2018). Federal courts have personal jurisdiction over a foreign state if (1) the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1330(a), and (2) plaintiffs properly effectuate service under 28 U.S.C. § 1608. *See* 28 U.S.C. § 1330(b). As explained above, the Court possesses subject matter jurisdiction over this dispute under Section 1330(a). The remaining issue is whether plaintiffs followed the procedures required by Section 1608(a).

The FSIA prescribes four valid methods of service. *See* 28 U.S.C. § 1608(a). If a method of service is unavailable or unsuccessful, a plaintiff may attempt the next method listed. *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 327 (D.D.C. 2014). First, a plaintiff should follow "any special arrangement[s]" for service—e.g., contractual provisions—between the plaintiff and the foreign state. 28 U.S.C. § 1608(a)(1). Second, a plaintiff may serve a defendant state "in

accordance with an applicable international convention" on service of process. *Id.* § 1608(a)(2). Neither option is available in this case. *See Lee*, 518 F. Supp. 3d at 495.

Plaintiffs thus attempted service under Section 1608(a)(3), which permits service by mailing copies of the complaint, summons, and notice of suit on a defendant state's head of ministry of foreign affairs. *See* 28 U.S.C. § 1608(e)(3); Aff. Requesting Foreign Mailing, ECF No. 5–7. When that attempt failed, plaintiffs tried to serve Iran via diplomatic channels. *See id.* § 1608(a)(4); Aff. Requesting Foreign Mailing, ECF No. 15. According to the Department of State, these documents were served on August 10, 2020 and August 19, 2020, under cover of diplomatic note. Return of Service, ECF No. 16 & 17. The Court concludes that plaintiffs have complied with Section 1608(a)(4) and properly served Syria and Iran in accordance with the FSIA. The Court may exercise personal jurisdiction over the parties.

### C. Timeliness

Actions under the FSIA's terrorism exception "may be brought or maintained" only if filed "not later than" the later of (1) "10 years after April 24, 1996" or (2) "10 years after the date on which the cause of action arose." 28 U.S.C. § 1605A(b). But when a defendant state "fail[s] to enter an appearance or submit a filing at any stage of [a] case[]," it forfeits any potential statute-of-limitations defenses. *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1108 (D.C. Cir. 2019). A federal court has no authority to raise this statute of limitations defense "on behalf of an entirely absent defendant." *Id.* at 1112. Because neither Syria nor Iran have not appeared in this case— and, therefore, have not raised a statute-of-limitations defense—the Court will not, and indeed cannot, enforce the limitations period *sua sponte*.

### D. Venue

For civil actions "against a foreign state or political subdivision thereof," venue is proper "in the United States District Court for the District of Columbia." 28 U.S.C. § 1391(f)(4). Iran and Syria are "foreign state[s]" as defined by Section 1603 of the FSIA. *See* 28 U.S.C. § 1603(a); *Henkin v. Islamic Republic of Iran*, No. 18-cv-1273 (RCL), 2021 WL 2914036, *4 (D.D.C. July 12, 2021). Since Syria and Iran are foreign states, the Court concludes that venue is proper in this District.

### E. Liability

The Court will now assess Syria and Iran's liability for the plaintiffs' injuries. The seven plaintiffs in this action bring claims under 28 U.S.C. § 1605A, some on behalf of themselves and some on behalf of the estate of Shoshana Ben-Yishai. *See* Am. Compl. ¶¶ 53–91. "Although § 1605A provides a private right of action, it requires plaintiffs to prove a theory of liability." *Schertzman Cohen*, 2019 WL 3037868, at *4 (internal quotations and citation omitted); *see also Rimkus*, 750 F. Supp. 2d at 175–76 ("[P]laintiffs in § 1605A actions . . . must articulate the justification for such recovery, generally through the lens of civil tort liability."). In adjudicating the plaintiffs' FSIA claims, courts "rely on well-established principles of law, such as those found in Restatement (Second) of Torts." *See In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009).

The Court reads the plaintiffs' complaint as advancing five main theories of liability: (1) wrongful death; (2) battery; (3) survival; (4) intentional infliction of emotional distress; and (5) negligent infliction of emotional distress.[5] However, plaintiffs who advance several theories of

---

[5] The Complaint lists eight separate claims. The first claim need not be addressed independently because it purports to be only a request for damages. *See* Am. Compl. (First Claim for Relief for Damages Under 28 U.S.C. § 1605A(c)). The second claim advances two theories of liability. *See id.* (Second Claim for Relief for Wrongful Death and Battery Under 28 U.S.C. § 1605A(a) and common law). In addition, the conspiracy and aiding and abetting claims, the sixth

liability "may recover under only one of any such theories, as multiple recovery is prohibited." *Valore v. Islamic Republic Iran*, 700 F. Supp. 2d 52, 77 (D.D.C. 2010) (citing *Beer v. Islamic Republic of Iran*, 574 F. Supp. 2d. 1, 13 (D.D.C. 2008)).

### 1. *Shoshana Ben-Yishai's Estate*

Shoshana Ben-Yishai, represented in this action by her parents through her estate, was born in New York and was a United States citizen at the time of the attack and, therefore, is entitled to bring claims against defendants. *See* 28 U.S.C. § 1605A(c); Am. Compl. ¶ 3.

#### a. *Wrongful Death*

Shoshana's estate may recover for her wrongful death. Wrongful death liability arises "upon establishing that the defendants caused her death." *Braun*, 228 F. Supp. 3d at 79 (citing Restatement (Second) of Torts § 925)). Successful plaintiffs are entitled to "economic losses which result from [the] decedent's premature death." *Id.* (citing *Valore*, 700 F. Supp. 2d at 78). Here, as discussed above, plaintiffs have presented satisfactory evidence that Shoshana's untimely death was the result of a killing perpetrated by the PIJ. Because the defendants materially supported the PIJ in carrying out the attack, they are liable to Shoshana's estate.

#### b. *Survival*

A survival action accrues at the time of death and allows recovery for "damages for loss or impairment of earning capacity, emotional distress and all other harms, to harms suffered before the death." *Id.* (citing Restatement (Second) of Torts § 926)). In the FSIA context, survival actions allow for the awarding of "damages for the victim's pain and suffering that occurred between the attack and the victim's death shortly thereafter." *Haim v. Islamic Republic of Iran*, 425 F. Supp.

---

and seventh claims, need not be addressed separately in view of this Court's determination, discussed *supra* in Part III.A, that the defendants provided material support to the PIJ, which also establishes their liability for acts, such as the attack, perpetrated by the PIJ. *See Braun*, 228 F. Supp. 3d at 78 n.5. Finally, the Court need not address the plaintiffs' vicarious liability claim, the eighth claim, as the MOIS is no longer a defendant.

2d 56, 71 (D.D.C. 2006). However, "a court must refuse to award damages for pain and suffering if the plaintiff is unable to prove that the decedent consciously experienced the time between an attack and his or her death." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015).

The plaintiffs have not provided sufficient evidence to demonstrate that Shoshana was conscious after the attack, and therefore have not met the required showing for a survival action. The plaintiffs assert "[f]rom the time of the French Hill Terrorist Attack until the time of her death, decedent Shoshana Ben-Yishai suffered great conscious pain, shock and physical and mental anguish." Am. Compl. ¶ 71. However, plaintiffs do not point to any evidence to support this assertion. Shoshana's father recalls that, following the attack, he "heard on the radio that one woman had been sent to Shaarei Zedek hospital and was dead on arrival" and that when he arrived at the hospital, he "was told Shoshana had been murdered." Yitzhak Ben-Yishai Decl., ECF No. 38, ¶ 2. Shoshana's mother recalls receiving a call from the school principal telling her that Shoshana had suffered a head injury and had been taken to Shaarei Zedek hospital. Miriam Ben-Yishai Decl., ECF No. 37, ¶ 4. Based on her experience as a nurse, Miriam Ben-Yishai knew that "if she had a head injury Shoshana would have been taken to Hadassah hospital since that was where the expert neurosurgical unit was located. Therefore, if she was indeed taken to Shaarei Zedek hospital, she must not have had a head injury but instead was dead." *Id.* She further recalls that when Yitzhak arrived at the hospital, "[h]e found Shoshana there in the morgue with her injury from the bullet at the back of her neck." *Id.* Based on the nature of her injuries as described by her parents and the relatively short window of time between the attack and confirmation of death, the Court is unable to determine if Shoshana survived after the attack, and thus unable to conclude that defendants are liable to her estate in a survival action.

2. *Yitzhak, Miriam, Jacob, Israel, Chana, Yael, and Aviel Ben-Yishai*

The remaining plaintiffs are Shoshana's parents and siblings. They may recover damages under the theories of battery and intentional infliction of emotional distress.[6] They are United States citizens and, therefore, are entitled to bring these claims against defendants. *See* 28 U.S.C. § 1605A(c); Am. Compl. ¶¶ 7–12.

a. *Battery*

Plaintiffs have established Syria and Iran's liability for battery. To be liable for battery, a defendant must act "[(1)] intending to cause a harmful or offensive contact with, or an imminent apprehension of such a contact by, those attacked and (2) a harmful contact with those attacked directly or indirectly resulted." *Wultz*, 864 F. Supp. 2d at 36 (internal alterations omitted) (quoting Restatement (Second) of Torts § 13). "[I]t is clear that defendants acted with intent to cause harmful contact and the immediate apprehension thereof: acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of such harm." *Id.* (quoting *Valore*, 700 F. Supp. 2d at 77). Syria and Iran, through the PIJ, intended to—and did—cause harm to civilians like Shoshana, and that contact indirectly created injury to the families. This is clearly sufficient to establish the defendants' liability under a battery theory.

---

[6] In the portion of their Complaint alleging wrongful death, plaintiffs state that the Attack caused "decedent, her estate and all the other plaintiffs severe injury, including: pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium." Am. Compl. ¶ 67. Accordingly, it appears the plaintiffs seek to recover for the emotional pain and suffering caused to them by Shoshana's death under a claim of wrongful death, as well as their claims for intentional and negligent infliction of emotional distress. This Court, mindful of the bar on double recovery and consistent with the practice of other courts in this District, will consider the defendants' pain and suffering liability to Shoshana's family members for harms resulting from Shoshana's wrongful death in the context of their emotional distress claims. *See Braun*, 228 F. Supp. 3d at 79–80; *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 76 (D.D.C. 2014). Also, because the plaintiffs have established entitlement to recovery under intentional infliction of emotional distress, and in light of the bar on double recovery, this Court will not address their claim of negligent infliction of emotional distress.

###### b. *Intentional Infliction of Emotional Distress*

Plaintiffs have similarly established Syria and Iran's liability under intentional infliction of emotional distress. As a threshold matter, even though plaintiffs were not present at the French Hill neighborhood bus attack, they are still proper plaintiffs under the FSIA. Section 1605A(a)(2) includes as plaintiffs "those whose claims arise out of those injuries" suffered as a result of a terrorist attack "but who might not be victims themselves." *Valore*, 700 F. Supp. 2d at 68; *accord Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 572 (7th Cir. 2012). One such category of permitted plaintiffs is the "immediate family" of claimants mentioned in 28 U.S.C. § 1605A(a)(2)(A)(ii). Shoshana's family members bring claims centered on their own emotional distress from her death, which resulted from the attack. This causal link brings the family member plaintiffs within the scope of claimants contemplated by the FSIA. *See id.* at § 1605A(a)(2).

This Court has set out the following standard for recovery on an intentional infliction of emotional distress theory in Section 1605A(c) cases: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (quoting Restatement (Second) of Torts § 46(1)). An actor may also be liable for intentional infliction of emotional distress to a party against whom the extreme and outrageous conduct was not directed if that party is a member of the victim's immediate family and that party was present at the time of the extreme and outrageous conduct. *See Murphy v. Islamic Republic of Iran,* 740 F. Supp. 2d 51, 75 (D.D.C. 2010) (citing Restatement (Second) of Torts § 46(2)). Thus, intentional infliction of emotional distress claims by family members in the FSIA context must meet both the "immediate family member" and "presence" requirements to recover. As previously discussed, the plaintiffs here meet

the "immediate family" requirement. *See Roth*, 78 F. Supp. 3d at 400. As to the issue of presence, one "need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result." *Valore*, 700 F. Supp. 2d at 80. This is because terrorism is sufficiently extreme and outrageous to demonstrate that it is intended to inflict severe emotional harm on even those not present at the site of the act. *Id.*; *Murphy*, 740 F. Supp. 2d at 74 ("Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress") (quoting *Belkin*, 667 F. Supp. 2d at 22).

The plaintiffs have stated a valid theory of recovery as to their intentional infliction of emotional distress claim. The evidence establishes that Syria and Iran intentionally provided material support to the PIJ with the intent that the PIJ would carry out attacks that would cause severe emotional distress. And the attack did cause such mental anguish and emotional trauma, which all of Shoshana's family members still experience. *See infra* Part III.F.c.iii. Although the family member plaintiffs do not allege that they were present at the site of the attack, this requirement is not imposed when the extreme and outrageous conduct is a terrorist attack such as the ones alleged. Thus, Iran and Syria are liable to plaintiffs for solatium damages. *See Roth*, 78 F. Supp. 3d at 402.

### F.  Damages

The Court will now discuss the damages that the plaintiffs will be awarded. The plaintiffs seek compensatory damages for "pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium," Am. Compl. ¶ 67, as well as punitive damages, *id.* ¶¶ 69, 73, 78,

83, 87.[7] All such forms of damages are potentially available, *see* 28 U.S.C. § 1605A(c), provided that plaintiffs "prove the amount of damages by a reasonable estimate consistent with this [Circuit]'s application of the American rule on damages." *Roth*, 78 F. Supp. 3d at 402 (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (internal quotation marks omitted and alteration in original)). "In determining the 'reasonable estimate,' courts may look to expert testimony and prior awards for comparable injury." *Braun*, 228 F. Supp. 3d at 82 (citing *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012) and *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008)).

The damages to which each plaintiff is entitled are described below.

*1.  Economic Damages*

Shoshana's estate seeks to recover for "pecuniary loss and loss of income." *See, e.g.*, Am. Compl. ¶ 67. In support of this damages claim, the plaintiffs present the declaration and report of Mr. Michael Soudry, an expert in forensic accounting, who calculated Shoshana's expected future earnings. Mr. Soudry declared that, due to Shoshana's untimely death, her estate experienced a net economic loss of $1,011,835. Soudry Rep. at 1. Therefore, the Court will award economic damages to Shoshana's estate in the amount of $1,011,835.00.

*2.  Pain and Suffering*

As discussed above, the plaintiffs have not presented satisfactory evidence that Shoshana was conscious between the attack and her death. Therefore, the Court cannot award any pain and suffering damages to her estate. *See Thuneibat*, 167 F. Supp. 3d at 39 n.4 (declining to award survival damages where the plaintiffs "submitted no evidence, and made no argument in their

---

[7] The Court will discuss damages owed to the family members resulting from their intentional infliction of emotional distress claim as solatium damages. *See Roth*, 78 F. Supp. 3d at 402 ("Solatium under the FSIA is functionally identical to intentional infliction of emotional distress.").

memorandum, showing that either of the [v]ictims suffered any pain and suffering prior to their deaths in the suicide bombings, but instead . . . their deaths were more likely instantaneous"); *Mwila v. Islamic Republic of Iran*, 33 F. Supp. 3d 36, 42–43 (D.D.C. 2014) (declining to award survival damages where "[n]o one testified that any of the deceased victims survived the blast itself for any period of time, and the evidence indicates that they likely did not").

  3. *Solatium*

Yitzhak, Miriam, Jacob, Israel, Chana, Yael, and Aviel Ben-Yishai seek solatium damages to compensate for the emotional distress they experienced as family members of Shoshana. *See* Am. Compl. ¶ 67. This Court developed a standardized approach to calculating FSIA solatium damages in *Heiser v. Islamic Republic of Iran*, where it surveyed past awards in the context of deceased terrorism victims to determine that, based on averages, "parents [typically] receive greater awards than siblings." 466 F. Supp. 2d 229, 269 (D.D.C. 2006). Relying upon the average awards, the Court in *Heiser* articulated a framework in which parents of deceased victims were awarded approximately $5 million and siblings received $2.5 million. *Id.*; *see also Valore*, 700 F. Supp. 2d at 85 (observing that courts have "adopted the framework set forth in *Heiser* as 'an appropriate measure of damages for the family members of victims'" (internal citation omitted)).

Courts may deviate from the *Heiser* baseline, especially when there is "evidence establishing an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26–27 (D.D.C. 2011). "Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in

each case[.]" *Id.* at 26. Finally, any departures from the *Heiser* framework are generally small relative to the award specified by the developed framework, absent "circumstances that appreciably worsen" a claimant's "pain and suffering, such as cases involving torture or kidnapping." *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 108 (D.D.C. 2006); *see also Haim*, 425 F. Supp. 2d at 75.

The plaintiffs argue that a higher award of solatium damages than the initial *Heiser* framework numbers of at least $5 million each to Shoshana's parents and $2.5 million each to Shoshana's siblings is warranted here. With respect to Shoshana's parents, the plaintiffs urge a higher number is appropriate because "Shoshana, as the oldest child, was truly the glue of their family and her sudden and violent death destroyed Miriam and Yitzhak's lives and their family for the worse with long lasting effects and trauma." Pls.' PFFCL at 63. Additionally, the plaintiffs argue that this Court should award Shoshana's siblings more than the baseline "because Shoshana was like a second mother to her siblings and her sudden and violent death destroyed her brothers and sisters' childhoods with profound adverse permanent long term effects on their lives." *Id.* The Court will discuss its award of solatium damages to Shoshana's parents and then her siblings.

#### a.  *Miriam and Yitzak Ben-Yishai*

Shoshana's parents suffer from depression and other disorders as a result of her death. In her declaration, Miriam notes that Shoshana was her "right hand" and Miriam "always rel[ied] upon her." Miriam Ben-Yishai Decl. ¶ 18. Miriam recounts that Shoshana was "a central figure in [her] home and family" in many respects, including assisting in the family's transition to Israel from New York, raising her younger siblings, and providing emotional support to her parents. *Id.* Miriam also shares that she was two months pregnant at the time of Shoshana's death but suffered a miscarriage shortly thereafter. Miriam Ben-Yishai Decl. ¶ 10. Dr. Rael Strous, the expert

psychiatrist who examined Miriam, diagnosed her with "Persistent Complex Bereavement Disorder," "Post-traumatic Stress Disorder," and "Persistent Depressive Disorder." Miriam Ben-Yishai Rep., ECF No. 42-5, at 9. According to Dr. Strous, because of the attack and Shoshana's death, Miriam "remains suffering intensely" and that "[s]he clearly describes the intensity of her pain and ongoing distress associated with dysfunctional family relationships and preoccupation with the welfare of her family members." *Id.* at 8. Dr. Strous states that "it is not expected that her mood and complicated grief issues affecting many areas of her personal and interpersonal functioning will resolve in the short term, and they will continue to affect her indefinitely." *Id.*

Like Miriam, Yitzhak Ben-Yishai feels the continuing emotional pain stemming from Shoshana's death. Yitzhak Ben-Yishai Decl. ¶ 8. In particular, he states that "nothing tempers the pain" from the loss of Shoshana and that he "continue[s] on solely as a responsibility [he] owe[s] to [his] wife and other children—a responsibility [he] can barely meet because of the pain [he] endure[s] every day." *Id.* ¶ 16. Dr. Strous diagnosed Yitzhak Ben-Yishai with "Persistent Complex Bereavement Disorder," "Post-traumatic Stress Disorder," and "Persistent Depressive Disorder." Yitzhak Ben-Yishai Rep., ECF No. 42-7, at 8. Dr. Strous observed that Yitzhak "experienced significant social, occupational and emotional effects over the past years majorly affecting his function in several areas of his life including loss of ability to work as he did prior to his daughter's death and significant dysfunction in family and social relationships." *Id.* at 7. Like his assessment of Miriam, Dr. Strous believes that "it is not expected that [Yitzhak's] mood, anxiety and grief difficulties affecting many areas of his personal and interpersonal functioning will resolve in the short term, and they will continue to affect him indefinitely." *Id.*

This lasting mental anguish that Shoshana's parents experience warrants an upward departure from the *Heiser* framework. Though Miriam and Yitzhak were not present at the scene

of the attack, they have first-hand observations and vivid memories of their daughter's lifeless body shortly afterward. These emotionally traumatic experiences were compounded by the loss of their unborn child and their continuing struggles with mental and emotional health. Thus, the Court finds it appropriate to award a 25 percent enhancement from the *Heiser* framework—for a total of $6,250,000 each—to Miriam and Yitzhak Ben-Yishai. This enhancement is consistent with decisions by other courts in this District to award enhanced damages to parents suffering persistent, significant distress emotional due to the death of their child. *See Braun*, 228 F. Supp. 3d at 86.

### b. Jacob, Israel, and Chana Ben-Yishai

Jacob, Israel, and Chana, the next-eldest Ben-Yishai children after Shoshana, have acutely felt the impact of Shoshana's death.

Jacob was thirteen years old at the time of the attack. Jacob Ben-Yishai Decl., ECF No. 30, ¶ 2. Dr. Strous notes that, after Shoshana's death, Jacob experienced "severe withdrawal (school, social), low mood and associated post-traumatic symptomatology lasting several years to the present." Jacob Ben-Yishai Rep., ECF No. 42-4, at 10. He has been treated by numerous psychologists and psychiatrists, hospitalized several times, attempted suicide, and is currently being treated with a psychiatric medication. Jacob Ben-Yishai Decl. ¶¶ 12–15. Jacob's conditions make it difficult for him to maintain relationships or consistent employment. *Id.* ¶¶ 18–21. Dr. Strous, in his expert opinion, diagnosed Jacob with "Persistent Complex Bereavement Disorder," "Post-traumatic Stress Disorder," and "Persistent Depressive Disorder." *See* Jacob Ben-Yishai Rep. at 10.

Israel, who was eleven years old at the time of Shoshana's death, Israel Ben-Yishai Decl., ECF No. 40, ¶ 4, has been hospitalized on multiple occasions as a result of "the development of an affective disorder in his teens later being expressed in full blown bipolar disorder." Israel Ben-

Yishai Rep., ECF No. 42-8, at 7–8. Dr. Strous further states that "[i]t is known that bipolar disorder is associated with the negative consequences of early life stress, as well as childhood trauma. The extremely adverse childhood experience of losing a sister close to him under such sudden and violent circumstances may be associated with his later development of bipolar disorder." *Id.* at 8. Due to his bipolar diagnosis and condition, Israel is categorized as disabled and receives support from the Israeli health system. Israel Ben-Yishai Decl. ¶ 15. Israel lives with his parents. *Id.* ¶ 3.

Chana was eight years old when the attack occurred and feels that her identity has been defined by the attack, primarily because her parents expected her to fill Shoshana's role in the family. *See* Chana Ben-Yishai Decl., ECF No. 31, ¶¶ 2, 14, 21. After experiencing "emotional difficulties, social difficulties, and difficulties in learning at school" in the wake of the attack, Chana "was referred for comprehensive psychological testing," which led to further psychiatric treatment and medication. Chana Ben-Yishai Rep., ECF No. 42-2, at 8. Chana, who continues to receive psychiatric treatment and medication, has been categorized as disabled by the Israeli health system. Chana Ben-Yishai Decl. ¶ 19. She lives with her parents and has been unable to maintain employment or relationships. *Id.* ¶¶ 2, 26. Dr. Strous, in his expert opinion, diagnosed Chana with "Persistent Complex Bereavement Disorder," "Post-traumatic Stress Disorder," and "Persistent Depressive Disorder." Chana Ben-Yishai Rep. at 9–10.

The Court finds that these serious, lasting impacts warrant an upward departure of 25 percent from the *Heiser* framework—for a total of $3,125,000 each—to Jacob, Israel, and Chana Ben-Yishai. *See Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37, 43–44 (D.D.C. 2012) (finding upward departure was appropriate when sister was hospitalized and received medication following the death of her sibling); *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F.

Supp. 2d 48, 83–84 (D.D.C. 2011) (awarding enhanced damages when sibling's death caused brother to exhibit "self-destructive behavior" and sister to suffer life-long depression).

### c. Yael and Aviel Ben-Yishai

Shoshana's remaining siblings, Yael, and Aviel, were quite young at the time of her death—6 and 4 years old, respectively. Yael Ben-Yishai Decl., ECF No. 29, ¶ 4; Aviel Ben-Yishai Decl., ECF No. 32, ¶ 3. The grief they experience has prevented them from pursuing personal relationships, educational, and employment opportunities, and has undermined their religious faith. *See* Yael Ben-Yishai Decl. ¶¶ 17–18; Aviel Ben Yishai Decl. ¶¶ 8, 12, 14. Dr. Strous diagnosed Yael and Aviel with "Persistent Complex Bereavement Disorder" and "Persistent Depressive Disorder." Aviel Ben-Yishai Rep., ECF No. 42-3, at 6–7; Yael Ben-Yishai Rep., ECF No. 42-6, at 6–7. However, their conditions have not required similar levels of treatment or medication as their siblings. Therefore, the Court finds it appropriate to award damages consistent with the *Heiser* framework—$2,500,000 each—to Yael and Aviel Ben-Yishai.

### 4. Punitive Damages

The plaintiffs also seek punitive damages. Punitive damages serve to punish and deter the actions for which they are awarded, rather than to compensate the victim. *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 61; *Heiser II*. In determining the proper punitive damages award, courts evaluate four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Acosta*, 574 F. Supp. 2d at 30 (citing Restatement (Second) of Torts § 908)). Though there was some confusion among circuits as to whether punitive damages were available in 28 U.S.C. § 1065A actions for conduct occurring prior to the statute's enactment, such as the instant case, the Supreme Court recently answered the

question in the affirmative. *See Opati*, 140 S. Ct. at 1608 ("Congress was as clear as it could have been when it expressly authorized punitive damages under § 1605A(c) and explicitly made that new cause of action available to remedy certain past acts of terrorism.").

This District has developed three primary methods of calculating punitive damages in FSIA cases. The first, used more commonly in mass-casualty events, involves multiplying the foreign state's "annual expenditures on terrorism" by a factor between three and five. *See Valore*, 700 F. Supp. 2d at 87–88. The second approach awards a fixed amount of $150 million per affected family. *See Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 75 (D.D.C. 2008). The third approach involves multiplying the total compensatory damages award by a factor of between one and five. *See Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 73 (D.D.C. 2015). The multiplier approach is especially appropriate when the defendants "did not directly carry out the attack, but funded [a proxy actor], [and] it is doubtful whether a large amount . . . would have the deterrent effect that it might have had in times past." *Cohen v. Islamic Republic of Iran*, 268 F. Supp. 3d 19, 28 (D.D.C. 2017) (quoting *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 26 (D.D.C. 2016)).

The nature of the defendants' acts is heinous and the extent of the harm they caused is tragic. Defendants intentionally supported a proxy actor who specifically sought to wreak violence upon innocent civilians. Nevertheless, the conduct here fits more squarely within the line of cases awarding punitive damages as a multiplier of compensatory damages. Given that punitive damages calculated as "a multiplier of three" of the compensatory damages is "the usual practice in state sponsored terrorism cases," *see Roth v. Islamic Republic of Iran*, No. 14-cv-01946 (RCL), 2018 WL 4680270, at *17 (D.D.C. Sept. 28, 2018), and the plaintiffs have not offered a reason to depart from this practice, this Court concludes that the plaintiffs are entitled to punitive damages in the

amount three times the compensatory damages, to be apportioned according to each plaintiff's share of the compensatory damages. *See id.* (awarding punitive damages equal to three times compensatory damages for Syria and Iran's sponsorship of a bombing in Jerusalem that killed fifteen people, including a plaintiff); *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 105–06 (D.D.C. 2017) (awarding punitive damages equal to three times compensatory damages for plaintiffs injured in a shooting in Israel); *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 50–51 (D.D.C. 2012) (using a three times multiplier in a case involving a terrorist bombing); *Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.D.C. 2011) (same); *Murphy*, 740 F. Supp. 2d at 82–83 (same).

### G. Prejudgment Interest

Lastly, the Court will address the plaintiffs' request for prejudgment interest to be applied to their damages award. Whether to award prejudgment interest is a matter committed to the discretion of the court, subject to equitable considerations. *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997). Prejudgment interest may be awarded on compensatory damages but there are limitations on when such awards are appropriate. First, prejudgment interest should not be added to economic loss damages when such awards are already discounted to present value because this would result in double counting of the interest multiplier. *See Doe v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 185–86 (D.D.C. 2013). Also, this Court has consistently declined to award prejudgment interest on solatium damage awards calculated according to the *Heiser* framework. *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 58–59 (D.D.C. 2012). This is because the *Heiser* framework represents a calculation of the appropriate level of compensation, regardless of an attack's timing. *Id.*

Plaintiffs have requested prejudgment interest. *See* Am. Compl. at 23. The Court concludes, however, that it cannot award such interest. First, the economic loss damages awarded to the estate of Shoshana Ben-Yishai have already been discounted to present value. *See* Soudry Rep. at 1. Second, as discussed above, the Court does not award prejudgment interest on solatium damage awards that are based on the *Heiser* framework, as the awards here are. These rules encompass every type of compensatory damages the Court is awarding in this case.

## IV.    CONCLUSION

For the reasons outlined above, the plaintiffs' motion for default judgment will be **GRANTED**. The defendants are jointly and severally liable for the death of Shoshana Ben-Yishai and the injuries to the family member plaintiffs on all claims except for survival. The plaintiffs are awarded monetary damages in the following amounts: the plaintiffs are entitled to $83,660,505 in punitive damages; Shoshana Ben-Yishai's estate is entitled to $1,011,835 in economic damages; Shoshana's parents, Yitzhak and Miriam Ben-Yishai, are each entitled to $6,250,000 in solatium damages; Jacob Ben-Yishai is entitled to $3,125,000 in solatium damages; Israel Ben-Yishai is entitled to $3,125,000 in solatium damages; Chana Ben-Yishai is entitled to $3,125,000 in solatium damages; Yael Ben-Yishai is entitled to $2,500,000 in solatium damages; and Aviel Ben-Yishai is entitled to $2,500,000 in solatium damages. Thus, the total damages award is $111,547,340.

A separate and consistent Order shall issue this date.

SIGNED this _____ day of November, 2022.

Royce C. Lamberth
United States District Judge